ATTORNEYS FOR APPELLANT
Steve Carter
Attorney General of Indiana

Stephen R. Creason
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Jessie A. Cook
Deputy Public Defender
Terre Haute, Indiana

Michael E. Deutsch
Deputy Public Defender

John L. Stainthorp
Erica Thompson
Chicago, Illinois

ATTORNEYS FOR AMICI CURIAE
INDIANA BLACK CAUCUS
CENTER FOR CONSTITUTIONAL
     RIGHTS
CENTER FOR JUSTICE IN CAPITAL
     CASES
CHARLES HAMILTON HOUSTON
     INSTITUTE FOR RACE AND
     JUSTICE
CRIMINAL JUSTICE INSTITUTE
ILLINOIS ASSOCIATION OF
     CRIMINAL DEFENSE LAWYERS
NATIONAL CONFERENCE OF BLACK
     LAWYERS
NATIONAL LAWYERS GUILD
NATIONAL LEGAL AID &
     DEFENDER ASSOCIATION
Andrea D. Lyon
Chicago, Illinois

Monica Foster
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 02S03-0508-PD-364

STATE OF INDIANA,

_Appellant (Plaintiff below)_,

v.

ZOLO AGONA AZANIA,

---

Interlocutory Appeal from the Allen Superior Court, No. 02D04-8109-CF-401
The Honorable Steve David, Special Judge

---

On Interlocutory Appeal

---

**May 10, 2007**

**Sullivan, Justice.**

In prior proceedings, this Court affirmed Zolo Agona Azania's conviction for the 1981 murder of a Gary police officer but set aside the recommendations of two juries that he should receive the death penalty. The trial court has now ruled that, given circumstances caused by the long delay in this case, Azania's constitutional rights to a speedy trial and due process would be violated if the State continues to seek a death sentence. We find that neither the delay nor any prejudice that Azania may suffer from it violates his constitutional rights. The State may continue to seek the death penalty.

**Background**

This case's history began with the killing of Gary Police Lieutenant George Yaros during a 1981 bank robbery.[1] The State charged Defendant Zolo Agona Azania, then known as Rufus Lee Averhart, and two other men with murder and sought the death penalty. The defendants' request for a change of venue from Lake County was granted to Allen County.

Under Indiana's death penalty statute, a capital trial is divided into two principal stages. Ind. Code § 35-50-2-9 (2006). During the first, the State bears the burden of proving the accused guilty beyond a reasonable doubt of murder. If the accused is found guilty of murder, a second stage follows during which the State again has the burden of proving beyond a reasonable doubt certain facts justifying a death sentence. The judge pronounces the sentence after this second

---

[1] The particulars of the crime are detailed in opinions that precede this one. See, e.g., Averhart v. State, 470 N.E.2d 666 (Ind. 1984).

stage is completed. Although the statute refers to the first stage as the "trial stage" and the second as the "sentencing hearing," id. at § 9(d), they are commonly referred to as the "guilt phase" and "penalty phase," respectively, of the trial and we will use that parlance in this decision.

At the guilt phase trial, the jury found Azania and his co-defendants guilty. At the penalty phase trial, the jury recommended that only Azania be sentenced to death; the trial court subsequently did so. We affirmed both the conviction and sentence. Averhart v. State, 470 N.E.2d 666 (Ind. 1984).

Indiana law permits collateral challenges to convictions and sentences by means of requests for "post-conviction relief." Ind. Post-Conviction Rule 1. Azania successfully employed this procedure with respect to his death sentence, which this Court vacated, but not his murder conviction, which we affirmed. We remanded the case to the trial court for a new penalty phase. Averhart v. State, 614 N.E.2d 924 (Ind. 1993).

At the new penalty phase trial, the jury again recommended that Azania be sentenced to death and the trial court again did so. We affirmed the newly-imposed death sentence, Azania v. State, 730 N.E.2d 646 (Ind. 2000), but subsequently vacated it after Azania again successfully sought post-conviction relief. We again remanded the case to the trial court for a new penalty phase. Azania v. State, 778 N.E.2d 1253 (Ind. 2002).

Further proceedings at the trial court followed, including our appointment of Boone Circuit Court Judge Steve David to preside over the case as Special Judge. In early 2005, Azania asked the trial court to bar the state from seeking the death penalty in the new penalty phase because of the prejudice he would suffer due to the passage of time. The trial court granted Azania's motion and prohibited the state from seeking the death penalty in the new penalty phase. It is on the State's appeal of the trial court's order that Azania's case is before us again.

**Discussion**

**I**

The trial court concluded that the delay from the date of the killing of Lt. Yaros to the currently pending penalty phase "establishe[d] speedy trial and due process violations." (Trial Court Order ¶¶ 13 & 14, Appellant's App. at 928-29.) It held that "fundamental constitutional principles of fairness, due process and speedy justice" bar the State from continuing to seek that Azania be sentenced to death. (Trial Court Order ¶ 19, Appellant's App. at 930.)

This Court has been previously presented with and rejected claims that delay has violated a capital defendant's constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution. See Bieghler v. State, 839 N.E.2d 691, 697-98 (Ind. 2005); Moore v. State, 771 N.E.2d 46, 54 (Ind. 2002) (noting that such claims have become known as "Lackey claims" from Justice Stevens's suggestion in Lackey v. Texas, 514 U.S. 1045 (1995) (memorandum respecting denial of certiorari), that such a claim is important and would benefit from the attention of lower and state courts to test its viability). It appears that no Lackey claim has been successful. See Knight v. Florida, 528 U.S. 990, 992-93 (1999) (Thomas, J., concurring in denial of certiorari); id. at 993 (Breyer, J., dissenting from the denial of certiorari).

But Azania says he makes no Eighth Amendment or "Lackey" claim in this appeal. He contends instead that the delay in his case has violated the Speedy Trial Clause of the Sixth Amendment[2] and Due Process Clause of the Fourteenth Amendment[3] of the U.S. Constitution.[4]

---

[2] The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const. amend. VI. It was held to be applicable to the States through the Fourteenth Amendment in Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).

[3] The Fourteenth Amendment provides in relevant part: "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

[4] Azania also contends that the delay in his case violates the Due Course of Law and Speedy Trial Clauses of art. I, § 12, of the Indiana Constitution. It provides in relevant part: "[E]very person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered . . . speedily, and without delay." However, Azania offers no separate analysis of his state

4

This appears to be a novel claim in capital litigation. Azania points us to no case where it has been asserted; we have found only two.[5]

To put this claim in context, we begin with a few observations about the role of delay in criminal jurisprudence generally and capital litigation in particular.

There is no question but that delay can infringe upon the speedy trial and due process rights of individuals accused or convicted of committing crimes: delay between the commission of the crime and indictment;[6] delay between indictment and arrest;[7] delay between arrest and trial;[8] delay between trial and sentencing;[9] delay in processing appeals;[10] delay between appellate court decision and subsequent retrial;[11] and delay between appellate court decision and subsequent re-sentencing proceeding.[12] Nor is this an exhaustive list.[13]

---

constitutional claims. Where a party, though citing Indiana constitutional authority, presents no separate argument specifically treating and analyzing a claim under the Indiana Constitution distinct from its federal counterpart, we resolve the party's claim "'on the basis of federal constitutional doctrine and express no opinion as to what, if any, differences there may be' under the Indiana Constitution." Myers v. State, 839 N.E.2d 1154, 1158 (Ind. 2005) (citations omitted) (collecting cases).

[5] Both Hitchcock v. State, 673 So. 2d 859, 863 (Fla. 1996), and Moore v. State, 436 S.E.2d 201, 202 (Ga. 1993), denied similar claims with little discussion.

[6] United States v. Lovasco, 431 U.S. 783 (1977); United States v. Marion, 404 U.S. 307 (1971).

[7] Doggett v. United States, 505 U.S. 647 (1992).

[8] Barker v. Wingo, 407 U.S. 514 (1972).

[9] Pollard v. United States, 352 U.S. 354 (1957).

[10] United States v. Smith, 94 F.3d 204, 208 (6th Cir. 1996); United States v. Mohawk, 20 F.3d 1480, 1483 (9th Cir. 1994); Harris v. Champion, 15 F.3d 1538 (10th Cir. 1994); Allen v. Duckworth, 6 F.3d 458 (7th Cir. 1993); Burkett v. Fulcomer, 951 F.2d 1431, 1445-46 (3d Cir. 1991).

[11] Mohawk, 20 F.3d at 1483; Latimore v. Spencer, 994 F. Supp. 60, 67 (D. Mass. 1998).

[12] United States v. Thomas, 167 F.3d 299 (6th Cir. 1999); Gonzales v. State, 582 P.2d 630, 633 (Alaska 1978); Moore, 436 S.E.2d at 202; State v. Avery, 383 S.E.2d 224, 225 (N.C. Ct. App. 1989).

[13] See, e.g., United States v. Loud Hawk, 474 U.S. 302 (1986) (delay between dismissal of original indictment and subsequent indictment on same charges); Loud Hawk, 474 U.S. 302 (delay in processing interlocutory appeals); United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in United States Currency, 461 U.S. 555 (1983) (delay between a forfeiture action and seizure); United States v.

5

But there is another side to the delay coin. As the United States Supreme Court itself has observed, delay "may work to the accused's advantage." Barker v. Wingo, 407 U.S. 514, 521 (1972). The Court in Barker continued:

> Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

Id. The Barker Court went on to quote its earlier decision in an Indiana case, United States v. Ewell:

> "[I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."

Barker, 407 U.S. at 521 n.15 (quoting United States v. Ewell, 383 U.S. 116, 120 (1966)).

The foregoing observations relate to criminal litigation generally. Delay is a particular fact of life in capital litigation. It was in large part to eliminate unwarranted delay in capital litigation that this Court adopted Post-Conviction Rule 1(12), requiring successive petitions for post-conviction relief in capital cases to be approved by this Court prior to filing. So too Congress in adopting the Antiterrorism and Effective Death Penalty Act of 1996. See Williams v. Taylor, 529 U.S. 362, 386 (2000) (Stevens, J.). Judge Kosinski and Mr. Gallagher are undoubtedly correct when they observe, "The simple fact is the process takes so long because there is a concerted effort afoot to slow it down, and because our legal system requires scrupulous review before a death sentence can be carried out." Alex Kozinski & Sean Gallagher, Death: The Ultimate Run-On Sentence, 46 Case W. Res. L. Rev. 1, 25 (1995).

---

MacDonald, 456 U.S. 1 (1982) (delay between dismissal of military charges and subsequent indictment on civilian charges); Klopfer, 386 U.S. at 213 (delay between mistrial and new trial).

It is in this context – that those accused and convicted of crimes enjoy constitutional protections against delay but that delay is often sought as a tactical matter by defendants, especially defendants in capital cases – that we examine Azania's claims.

In consequence of this Court's remand order in 2002, Azania is entitled to a new penalty phase trial in which a jury would be convened to consider whether or not it believes that he should be sentenced to death. He contends that allowing the State to seek a death sentence in a new penalty phase trial would violate his speedy trial and due process rights because evidence that supports his case is no longer available and because the jury would likely focus on future dangerousness. As noted above, the trial judge found these contentions meritorious and granted the relief sought.

## II

There is authority to the effect that the Speedy Trial Clause does not apply to time periods after conviction and sentencing.[14] Here, of course, Azania does not assert that there was any speedy trial violation with respect to his original trial; his claim relates only to delay thereafter. Nevertheless, for several reasons, we elect to proceed on the theory that there is a speedy trial right implicated in this case. First, the State, while not conceding that the Speedy Trial Clause applies to Azania's claim, does analyze his claim using the (non-exclusive) four-factor test of Barker v. Wingo,[15] the United States Supreme Court's leading case on the Speedy Trial Clause.

---

[14] See Doggett, 505 U.S. at 655 ("the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution" (citing United States v. Marion, 404 U.S. 307, 313-320 (1971))); MacDonald, 456 U.S. at 8 ("The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations."); Ewell, 383 U.S. at 121 (refusing to apply the Speedy Trial Clause to a retrial following reversal of a conviction on collateral review); Allen v. State, 686 N.E.2d 760, 782 (Ind. 1997) ("A right to a speedy appeal is not contemplated within the Sixth Amendment.").

[15] The four factors, to be discussed in greater detail below, are the (1) length of delay, (2) reason for the delay, (3) defendant's assertion of the speedy trial right, and (4) prejudice to the defendant. Barker, 407 U.S. at 530-32. These factors, the Court said, are only "some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right." Id. "[N]one of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." Id. at 533.

7

Second, while Azania's claim relates only to delay after his original trial, he seeks relief with respect to a new penalty phase trial and the sentencing attendant thereto. Were this to be an original penalty phase trial and sentencing – which in a sense it is – the Speedy Trial Clause would clearly apply. Pollard v. United States, 352 U.S. 354, 361 (1957).[16] Third, analyzing Azania's claim under the Speedy Trial Clause is consistent with this Court's previous holding that retrial of a habitual offender adjudication following reversal on collateral review is subject to the requirements of our Speedy Trial Rule, Ind. Criminal Rule 4(B).[17] Poore v. State, 685 N.E.2d 36, 41 (Ind. 1997). Lastly, even if the delay in this case does not implicate the Speedy Trial Clause, it clearly does implicate the Due Process Clause. United States v. Smith, 94 F.3d 204, 207 (6th Cir. 1996) (collecting cases); United States v. Mohawk, 20 F.3d 1480, 1485 (9th Cir. 1994); Allen, 686 N.E.2d at 782-83. And courts use the Barker v. Wingo factors to analyze whether delay has caused a due process violation, even when the speedy trial right is not implicated. Smith, 94 F.3d at 207 (collecting cases); Mohawk, 20 F.3d at 1485; Allen, 686 N.E.2d at 783.

Barker's "balancing test" directs that we look first at delay: the "[l]ength of delay, the reason for the delay," and Azania's "assertion of his [speedy trial] right." Barker, 407 U.S. at 530. Azania's analysis is the "delay in this case is extraordinary and is not attributable to" him.

---

[16] Pollard, which pre-dated Barker, "assume[d] arguendo that sentence is part of the trial for purposes of the Sixth Amendment." Pollard, 352 U.S. at 361. Over time, this has been taken by most courts as authority for the proposition that the Speedy Trial Clause applies to sentencing. A helpful formulation of this authority was set forth by Justice Souter, writing as a member of the New Hampshire Supreme Court:

> If the Supreme Court has gone no further than to assume arguendo that there is a right to speedy sentencing, Pollard v. United States, . . . the lower federal courts have nonetheless taken this as "strong indication" that the sixth amendment has application to the time between conviction and sentencing. . . . While the Supreme Court in Pollard reviewed the claim by asking whether the delay was purposeful or oppressive, . . . , later federal cases have applied the Barker . . . analytical framework, . . . and have emphasized the burden on a defendant to demonstrate prejudice whenever it is not implicit in the circumstances. . . . Thus, we conclude that a Barker analysis is appropriate in assessing the federal claim . . . ."

State ex rel. McLellan v. Cavanaugh, 498 A.2d 735, 740 (N.H. 1985) (citations omitted) (Souter, J.). Justice Souter later authored what is, except for Barker itself, the United States Supreme Court's most important Speedy Trial Clause opinion. See Doggett, 505 U.S. 647.

[17] Azania makes no claim that his rights under Ind. Crim. R. 4(B) have been violated.

He breaks down the period of time between the date of his original trial and today into four segments.

- The first time segment runs from the date of the original trial in 1982 to 1993, when this Court denied him post-conviction relief with respect to his murder conviction but granted relief with respect to the death sentence. Azania contends that this period of "delay" is not attributable to him because in 1993, this Court found his sentence to be unconstitutional "based in part on the prosecution's withholding of evidence." (Br. of Appellee at 24.) (Our decision was also based, as Azania acknowledges, on a finding of ineffective assistance of counsel.)

- The second time segment runs from our remand (for a new penalty phase trial) in 1993 to 1996, when the new penalty phase trial was conducted and Azania was again sentenced to death. Azania argues that this period of "delay" is not attributable to him because much of it "was caused by the State's acts in forcing defendant's court appointed lawyer . . . and three of his expert witnesses, to withdraw, even though there was no basis for this." (Br. of Appellee at 25.)

- The third time segment runs from the date of re-imposition of the death sentence in 1996 to 2002, when we again set aside the death sentence because Azania demonstrated to our satisfaction that the computer program used to select the jury pool inadvertently operated to deny him his right to be tried before a fairly constituted jury. Azania's position is that this period of "delay" is not attributable to him because "he had nothing to do with the system of picking jurors which led to the unrepresentative jury." (Br. of Appellee at 25.)

- The fourth and last time segment runs from our remand (for a new penalty phase trial) in 2002 to 2005, when Azania first asserted that the delay to that point in time violated his speedy trial and due process rights. His view is that this period of "delay" is not attributable to him because it "has been almost entirely caused by litigation necessary to protect the defendant's constitutional rights and the State's repeated failures to prose-

cute the case with due diligence and to comply with discovery orders." (Br. of Appellee at 25.)

In ruling on the issue of delay, the trial court held as follows:

In analyzing the period of delay between Defendant's 1982 conviction and the currently pending penalty proceeding, it is clear from the record that the State bears most of the responsibility for the delay. Although blaming the State is not the appropriate analysis alone, the bottom line is that very little of the overall delay is attributable to the Defendant. Again, the issue is not so much whether the State is at fault for the delay or should be at fault for the delay, but rather that the Defendant should not be held responsible or faulted for much of the delay. After all, it is the State seeking to impose the death penalty and the Defendant has the right to defend himself and his life. The record of this case reflects that most of the delay attributable to Defendant is in pursuit of this right.

(Trial Court Order ¶ 12, Appellant's App. at 928.)

In evaluating whether delay has violated a defendant's constitutional rights, we review issues of fact using a clear error standard and questions of law de novo. See United States v. Thomas, 167 F.3d 299, 303 (6th Cir. 1999); Smith, 94 F.3d at 208; United States v. Clark, 83 F.3d 1350, 1352 (11th Cir. 1996).

We accept Azania's and the trial court's characterizations of this chronology as true but neither of them has analyzed this time period using the legal test mandated by the United States Supreme Court in Barker v. Wingo.

The over-arching rationale of Barker is that the speedy trial right is "generically different" from other constitutional rights of an accused, Barker, 407 U.S. at 519, in large part because defendants frequently deploy delay for "strategic, tactical, or other reason[s]," Id. at 526 n.25 (citation omitted), and have every right to do so. As a consequence, it is not enough to make out a constitutional violation to say only that the State has caused delay or that a defendant has not. Rather, the inquiry must include consideration of the reasons for the delay assignable to the State

10

and "whether and how" a defendant has asserted the speedy trial right. The following excerpts from the <u>Barker</u> opinion make these points clear:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

> . . .

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

<u>Barker</u>, 407 U.S. at 531, 531-32 (footnotes omitted).

The trial court's analysis of the delay factor was erroneous because it did not consider the reasons for the delay assignable to the State or "whether and how" a defendant has asserted the speedy trial right.

As set forth <u>supra</u>, Azania contends that most of the delay in the case is attributable to the State. We find this to be an overstatement.

During much of the period of time in question, Azania and not the State had the responsibility of going forward. That is, it was Azania's responsibility (1) to prosecute the appeal following the completion of the original trial and imposition of the death sentence; (2) to prosecute his request for collateral review following the conviction and death sentence being affirmed on direct appeal; and (3) to prosecute his subsequent request for collateral review following the re-imposition of the death sentence.

11

Virtually all of the appellate decisions regarding the speedy trial right involve claims of delay with respect to proceedings in which the State has the burden of prosecution, of going forward. Barker v. Wingo is just such a case. Because of this, the default position in Barker is that any delay that is not specifically attributable to the defendant is laid at the doorstep of the State. (As noted above, even delay attributable to the State will not be weighted heavily where there is a "valid reason" for it.) But we believe that the default position should be and is reversed when the defendant, rather than the State, has the burden of going forward – as the defendant does when the defendant prosecutes either an appeal or a petition for collateral review.

We therefore hold that a defendant who asserts a violation of his constitutional right to a speedy trial with respect to any period of time during which the defendant has the burden of prosecuting either an appeal or a petition for collateral review bears the burden of demonstrating some action on the part of the State that has delayed the defendant's appeal or collateral proceeding. In this case, we will not attribute to the State any of the delay in the three time periods described above during which Azania had the responsibility of going forward absent a showing by Azania of action by the State during these periods that hampered his ability to go forward.

Azania's only contention in this regard is that the State's withholding of evidence during the original trial caused the delay from 1982 to 1993, the period from completion of the original trial and imposition of the death sentence through completion of collateral review of the original conviction and death sentence. We hold to the contrary. While the withholding of evidence was one of the grounds on which Azania sought review, it in no way caused any of the delay during this period of time. Said differently, we hold that even if the State had not withheld the evidence, there is absolutely no reason to believe that Azania would not still have appealed his conviction and sentence and sought collateral review after they had been affirmed. We find no delay during this period of time caused by the State's withholding of evidence at trial. And, of course, Azania received relief for the State's withholding of evidence at the original trial when we vacated his original death sentence and ordered a new penalty phase trial.

Azania has not identified any other actions of the State during the three periods of time in this case during which he had the burden of going forward that hampered his ability to do so.

12

More to the point, he did not argue on direct appeal or in any of his requests for post-conviction relief that he was the victim of unconstitutional delay caused by the State.

This brings us to the three periods of time during the history of this case when the State has had the responsibility of going forward: (1) from the date of the crime through Azania's conviction and the imposition of the original death sentence; (2) following our first remand for a new penalty phase trial through the re-imposition of the death sentence; and (3) during the current period following our second remand for a new penalty phase trial.

Azania makes no contention of delay with respect to the first of these periods. During the second of these periods, Azania contends that the State "forced defendant's court appointed lawyer . . . and three of his expert witnesses to withdraw" during the 1993 to 1996 time period. (Br. of Appellee at 24-25.) We accept as true that "changes in defense counsel and defense experts result[ed] from the claims of the State and the Allen County Sheriff's Department that defense counsel and several defense experts had a conflict." (Trial Court Order ¶ 8, Appellant's App. at 928.) Azania asserts that "there was no basis for this" but gives no explanation. (Br. of Appellee at 25.) The Trial Court Order does not suggest that the State's motives were not legitimate.

When Azania appealed the re-imposition of the death sentence in his second penalty phase trial, he did not raise any claim with respect to this matter. See Azania, 730 N.E.2d 646. He subsequently did seek post-conviction relief on this issue, which we dismissed as untimely:

> The penalty phase retrial record indicates that, more than one year and four months before the penalty phase retrial actually occurred, the State filed a "Motion for Hearing Regarding Conflict of Interest" disclosing that Azania's lead defense counsel, Donald Swanson, was then a member of the Sheriff's Merit Board; that defense investigator Jerry Ratajczak was then a Deputy Allen County Sheriff; and that defense forensic pathologist, Scott Wagner was then employed by the Allen County Coroner. In seeking the motion, the State represented that it sought to disclose potential conflict of interest information to the defendant and "to obtain a waiver of the defendant, upon the advice of independent counsel." A hearing on the motion was conducted and the defense waived the conflict. Swanson withdrew fifteen days later. After Azania's penalty phase retrial and sentencing proceedings, Azania, acting pro se, filed a "Motion For Contempt of Court Proceedings Against Sheriff Joseph M. Squadrito" to which was attached a copy

of a newspaper article reporting Azania's claims that Allen County officials prevented investigator Ratajczak and Dr. Wagner from joining his defense team, and that Swanson withdrew from the case "after his proposed defense team fell apart."

These claims were thus available but not raised in the appeal from the retrial. The claims are not available here.

Azania v. State, 738 N.E.2d 248, 252 (Ind. 2000) (citations omitted).

Taken at face value, the concern of the Sheriff appears to have been legitimate and not to have unduly delayed the proceedings.

Merits aside, Azania did not argue that the State's actions in this regard unconstitutionally delayed his new penalty phase trial either to the trial court or to us on appeal following re-imposition of the death sentence. Having failed to contend either to the trial court or on appeal that he was the victim of any unconstitutional delay caused by the State during the period following our first remand for a new penalty phase trial through the re-imposition of the death sentence, we hold that he has forfeited his right to make that claim now.

During the current period, that is, following our second remand for a new penalty phase trial, Azania contends that the State hampered his defense and improperly delayed the proceedings by failing to comply with discovery orders during the period from July 30, 2003, to November 2004. The State acknowledges that it did improperly fail to comply with discovery orders and says it "accepts appropriate responsibility for its actions." (Br. of Appellant at 11.)

During the current period, Azania took several actions that also delayed the new penalty phase trial. First, in January 2003, he asked that venue in the case be returned to Lake County. When his request was denied, he filed an interlocutory appeal. This Court declined jurisdiction in June 2003. Second, in September 2003 (while the discovery requests mentioned above were pending), Azania initiated a series of requests that resulted in the recusal of three judges in Allen County from the case and our appointment in February 2004, of Judge David as Special Judge. Third, in March 2004 (again, while the discovery requests mentioned above were pending), Azania requested that the new penalty phase trial date be postponed from April 2005, to January

14

2006, so that he could conduct additional discovery concerning the jury selection process used in Allen County.

When balanced against Azania's own actions, we find that the State's improper failure to comply with discovery orders did not delay the new penalty phase trial for purposes of our speedy trial analysis. Azania's own requests to disqualify the local judges and his request to conduct additional discovery concerning the jury selection process delayed the new penalty phase trial for an even longer period of time independent of the State's improprieties.

In summary, we hold that Azania has not been the victim of any delay in this case that violates any constitutional right he may have to a speedy trial.

**III**

We are of the view that, having failed to demonstrate any unconstitutional delay in his case, Azania is unable to make out a speedy trial violation under Barker v. Wingo. However, he also claims that the delay in his case has violated his due process rights and, as discussed supra, the law is clear that delay in criminal proceedings can constitute a due process violation even if a person's speedy trial rights are not violated. Smith, 94 F.3d at 207 (collecting cases); Mohawk, 20 F.3d at 1485; Allen, 686 N.E.2d at 783. Also as discussed supra, the analysis of whether delay causes a due process violation is identical to the analysis under the prejudice factor of Barker and so we proceed on that basis. Smith, 94 F.3d at 207 (collecting cases); Mohawk, 20 F.3d at 1485; Allen, 686 N.E.2d at 783.

Having already reviewed the first three factors of the Barker test in part II, supra, we turn to the fourth – prejudice. We measure prejudice by the extent, if any, the delay in this case would jeopardize the viability of his defense at a new penalty phase trial.[18] See Smith, 94 F.3d at 211; Mohawk, 20 F.3d at 1486.

---

[18] Other types of prejudice sometimes found to result from appellate delay such as oppressive incarceration pending appeal and anxiety and concern of a convicted individual awaiting the outcome of the appeal are clearly not applicable here. Cf. Mohawk, 20 F.3d at 1485-86.

At a new penalty phase hearing, the jury would be asked to make three determinations: (1) whether the State has proved beyond a reasonable doubt the existence of the charged aggravating circumstances;[19] (2) whether the aggravating circumstances outweigh any mitigating circumstances; and (3) whether Azania should be sentenced to death or a term of years. I.C. § 35-50-2-9 (1982). Azania contends that if the State is permitted to seek the death penalty, he will be the victim of prejudice in violation of his constitutional right to due process in the following respects:

- The delay in this case will cause prejudice in that "the jury would undoubtedly take into account the perceived future dangerousness of the defendant."

- The delay in this case has resulted in the unavailability of important mitigation witnesses.

- The delay in this case has resulted in the unavailability of witnesses and evidence that are needed to defend against the State's contention of the existence of the charged aggravating circumstances.

The trial court analyzed these claims of prejudice and found that they established "speedy trial and due process violations":

There is merit to the Defendant's argument that given the 23 plus year passage of time from original trial and death penalty sentence to the most recent death penalty proceeding, the jury will likely conclude that the Defendant if not given the death penalty, will soon be released from prison. This "future dangerousness" issue is very relevant. This finding is based in part and supported by the expert opinion contained in the affidavit of William Bowers filed by the defendant in support of his motion which was based upon extensive empirical studies on death penalty jury deliberations. While the Court acknowledges under Indiana law that "future dangerousness" is not a factor the jury is allowed to consider during death penalty deliberations, under the specific facts of this case, which facts now include the significant time delay between conviction and sentencing, the

---

[19] The charged aggravating circumstances were: (1) intentionally killing the victim while committing or attempting to commit robbery, I.C. § 35-50-2-9(b)(1) (1982); and (2) the victim was a law enforcement officer acting in the course of duty, id. § 9(b)(6).

16

Court and all parties must recognize that there is no realistic way to prevent this issue from being in the minds of jurors as they deliberate the case. Thus the delay has reached constitutional proportions.

In addition to the "future dangerousness" issue, mitigation witnesses who could show the defendant's "extreme disadvantage and worthy habits and accomplishments," [Averhart], 614 N.E.2d at 930-931, have died, including the defendant's mother, aunt, family doctor, neighbors, spiritual advisor and co-workers. In addition other mitigation witnesses are now unable to be located.

Further, 11 out of 27 prospective State witnesses are dead or otherwise unavailable. These 11 witnesses constitute the core of the State's aggravation case and their unavailability precludes a jury from observing their demeanor and evaluating their credibility. In addition, the defense has raised challenges to the admissibility of the prior testimony of these unavailable witnesses based upon the inadequacy of the prior cross-examination, including the fact that 1982 defense counsel was found to have provided ineffective assistance of counsel in the penalty phase and co-counsel's cross-examinations were in conflict to Mr. Azania's interests.

Additionally, other witnesses on the issue of aggravation that the defense would wish to call to challenge the State's aggravation case have also died, including the coroner who conducted the autopsy of the deceased.

Further, some physical evidence has disappeared, including the X rays of the decedent, the mug shot taken at the time of the defendant's arrest, the gunshot residue disks and the test fire evidence.

Taking these issues together, the delay has significantly compromised Defendant's constitutional protections and as a result prejudice to the Defendant will result in allowing the State to proceed with the Death Penalty after so much time has elapsed.

(Trial Court Order ¶ 14, Appellant's App. at 929.)

As set forth supra, in evaluating whether delay has violated a defendant's constitutional rights, we review issues of fact using a clear error standard and questions of law de novo.

Azania's argument with respect to future dangerousness is as follows: because he has been in prison so long, the jury will be afraid that he will be released soon unless they sentence him to death; and sentencing a defendant to death on the basis of such future dangerousness is impermissible as a matter of law. Under Indiana death penalty law in effect at the time of Aza-

nia's crime, a person not sentenced to death is sentenced instead to a term of years. Azania's position is supported by an affidavit of Dr. William J. Bowers, a professor with a doctorate in sociology who has served as the director of the Capital Jury Project, a program that conducts research on the decision-making of capital jurors, including interviewing individuals who have served as jurors in capital trials. Dr. Bowers's affidavit concluded that:

> With the passage of such a long period of time from the date of the crime, and the jurors' predispositions to believe that the defendant will soon be released from prison if he is not sentenced to death, such a reasoned [moral] choice becomes impossible, and the bias in favor of the death penalty becomes unavoidable and overwhelming.

(Appellant's App. at 712.)

Azania correctly argues that "future dangerousness" is not an aggravating circumstance under our state's death penalty law and, as such, the jury cannot consider it when assessing the Stae's request for a death sentence. As such, Azania's contention is that under the facts of this case, the social science evidence demonstrates that a new penalty trial jury would not be able to follow the law in the discharge of its duties.

It is a foundational principle of the jury system that a jury will follow the law and not act on the biases of its members. Pruitt v. State, 622 N.E.2d 469, 473 (Ind. 1993); Webster v. State, 413 N.E.2d 898, 901 (1980). Indeed, it is very hard to conceive how we could have trial by jury at all if social science evidence of "bias" on the part of a hypothetical jury would preclude the favored party from advancing a legal theory otherwise available to the party.[20] Instead, we have developed longstanding procedures for protecting against such bias through extensive voir dire, in limine restrictions, and carefully tailored jury instructions. We believe these mechanisms af-

---

[20] Compare Jordan v. Deery, 778 N.E.2d 1264, 1266 (Ind. 2002), a medical malpractice case in which we rejected the defendant's argument that the presence of the plaintiff (a young child with cerebral palsy in all four extremities and Erb's palsy in the left arm who could not talk, made involuntary movements and sounds, was sight impaired, and walked with the use of braces and a walker) in the courtroom during trial risked prejudicing the jury.

ford protection from any prejudice that Azania might otherwise suffer from jury consideration of "future dangerousness."

Furthermore, the ultimate sentencing decision is not that of the jury but of the judge. In this respect, the law governing this case differs from the law governing capital offenses committed today. Cf. I.C. § 35-50-2-9(e) (1982) ("The court shall make the final determination of the sentence, after considering the jury's recommendation . . . . The court is not bound by the jury's recommendation.") with id. (Supp. 2006) ("If the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly.").[21] While the jury must be instructed subject to the requirements of Caldwell v. Mississippi,[22] its decision as to whether Azania would be sentenced to death or not is a recommendation to the trial judge, who may impose a term of years notwithstanding a jury recommendation of death. See, e.g., Jones v. State, 697 N.E.2d 57, 58 (Ind. 1998). With the ultimate sentencing decision in the hands of the trial judge, not the jury, we think the effect of prejudice from any jury bias on account of future dangerousness is largely eliminated.

Azania's argument with respect to the unavailability of important mitigation witnesses is as follows:

> Many of Mr. Azania's mitigation witnesses are also deceased or not available. Important people in his family have died, including his mother and his aunt, and even though his mother testified before the judge at the 1982 sentencing, her testimony was never prepared by Mr. Azania's counsel and lasted less than a minute. Moreover, it is obvious that the impact of a transcript reading will be radically different from a mother's live testimony. Also the defendant's prior spiritual advisor is dead, and many people with whom Mr. Azania worked in the community around public interest issues prior to his arrest cannot be found. Even

---

[21] In Ring v. Arizona, 536 U.S. 584 (2002), the United States Supreme Court held that a jury, not a judge, was required to find an aggravating circumstance necessary for imposition of the death penalty. We assume without deciding that Ring would apply to a new penalty phase trial. However, we hold that the procedure to be followed in such a trial is that prescribed by I.C. § 35-50-2-9 (1982), with such limitations as Ring imposes. For an examination of various alternative penalty phase outcomes, see State v. Barker, 809 N.E.2d 312, 316 (Ind. 2004).

[22] "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985).

if they could, the value of their testimony concerning Mr. Azania's achievements will be substantially reduced because of the passage of time.

(Br. of Appellee at 23.)

We think that the unavailability of mitigation witnesses is the only consequence of delay that causes Azania prejudice. He has a constitutional right to mount as vigorous a mitigation case as he can muster. Penry v. Lynaugh, 492 U.S. 302 (1989); Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978). Juries cannot recommend death, nor trial judges impose it, unless they find that the aggravating circumstances proven beyond a reasonable doubt by the state outweigh all of the mitigating circumstances. I.C. § 35-50-2-9(e)(2) (1982). However, we do not find that this prejudice rises to the level of depriving Azania of his due process rights. It appears from the record that many if not all of these witnesses were also unavailable at Azania's second penalty phase trial, at which he advanced no argument that their unavailability impinged upon his due process rights. See Azania, 730 N.E.2d at 651. At a new penalty phase trial, we are confident, Azania will be able to assemble a highly credible presentation of those aspects of his upbringing and community involvement that are entitled to mitigating weight. If he elects to present this evidence, we believe that the jury will make an appropriate allowance for the fact that his mother, aunt, and prior spiritual advisor are no longer living. And, of course, Azania will have the opportunity of presenting evidence of remorse, Jones v. Polk, 401 F.3d 257 (4th Cir. 2005), and the testimony of any current spiritual advisor and others as to his accomplishments and contributions while incarcerated, Skipper v. South Carolina, 476 U.S. 1 (1986); Davis v. Coyle, 475 F.3d 761, 764 (6th Cir. 2007). In summary, given the wide latitude provided capital defendants in presenting mitigating circumstances, Tennard v. Dretke, 542 U.S. 274, 284 (2004) (in capital cases, a court must define relevance in "the most expansive terms"; evidence is relevant "if the sentencer could reasonably find that it warrants a sentence less than death"), we hold that the prejudice Azania would suffer because of the unavailability of the mitigating witnesses identified by him is not substantial enough to violate his due process rights.

Azania's argument with respect to the unavailability of witnesses and evidence that he needs to defend against the State's contention of the existence of the charged aggravating circumstances is as follows. First, he identifies four eyewitnesses, "upon whom the State based its

penalty phase case," to the shooting of Lt. Yaros who are "no longer available to give live testimony." Second, he says that the State's "key ballistics expert" is dead. Third, he says that at least two "additional material witnesses who were present inside the bank during the robbery are also dead or unavailable." Fourth, he says that a witness whose testimony linked him to the weapon that the State asserts fired the final shot is dead. And fifth, he says that certain physical and forensic evidence has been lost by the State, including gunshot residue discs, x-rays taken of Lt. Yaros prior to autopsy, and shirts from the test fires conducted by the ballistics expert.

At a new penalty phase trial, the State would again have the burden of proving beyond a reasonable doubt each of the elements of the two charged aggravating circumstances, to wit, (1) intentionally killing the victim while committing or attempting to commit robbery, I.C. § 35-50-2-9(b)(1) (1982); and (2) the victim was a law enforcement officer acting in the course of duty, id. § 9(b)(6). While the unavailability of these witnesses and this evidence may make it more difficult for Azania to defend against the State's case, we find that it creates far greater difficulty for the State to meet its burden of proof. In point of fact, every one of the witnesses that Azania specifically identifies as not being available – the four eyewitnesses to the shooting, the ballistics expert, the witnesses inside the bank, and the weapon-linking witness – were all State's witnesses. In United States v. Loud Hawk, the United States Supreme Court said, "[D]elay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry out this burden." 474 U.S. at 315. We think that that is precisely the result of the unavailability of these witnesses and this evidence. Azania has not made a showing of prejudice with respect to the unavailability of these witnesses and this evidence.

We hold that the delay and any resulting prejudice in this case will not violate Azania's due process rights if the State seeks the death penalty at a new penalty phase trial.

**Conclusion**

We reverse the judgment of the trial court and remand for a new penalty phase trial.

21

Shepard, C.J., and Dickson, J., concur. Boehm, J., dissents with a separate opinion. Rucker, J., dissents with a separate opinion.

**Boehm, J., dissenting.**

I respectfully dissent. I agree with Justice Rucker that due process concerns can arise if the passage of time substantially impairs the opportunity of a capital defendant to present mitigation evidence. However, in my view, it is not solely the passage of a substantial amount of time that can raise these concerns, but whether that time was attributable to failures of the State's criminal justice system. Ultimately, as I see it, this case presents an issue of cruel and unusual punishment.

Twenty-five years have passed since Azania was convicted of this crime in 1982. As explained below and as the trial court found, the bulk of that time is attributable to flaws in the criminal justice system, not to anything Azania did. In the meantime Azania has remained a death row inmate. That amount of time on death row at the hands of others is not unusual; it is extraordinary.[1] I conclude that further pursuit of the death penalty at this date violates the Indiana Constitution by imposing punishment that is both cruel and unusual. Accordingly, I would affirm Judge David's order dismissing further pursuit of the death penalty in this case.

Azania contends that his constitutional right to due process of law has been violated by this passage of time. The majority responds that to the extent delay is caused by the defense, Azania cannot be heard to complain of it. I agree. But the majority proceeds to attribute the delays in Azania's case to Azania. The keystone of the majority's reasoning is its holding that in determining the cause of any delay "during which the defendant has the burden of prosecuting either an appeal or a petition for collateral review," the defendant bears the burden of demonstrating that the State slowed the process.

I respectfully submit that this proposition is both novel and indefensible. As for novelty, I note only that the majority cites no authority, and I find none. The facts of Azania's long journey through the criminal processes of this state show the fundamental unfairness of this doctrine. Azania was convicted in 1982. He appealed, and his sentence and conviction were affirmed in

---

[1] The petitioner's time on death row in <u>Knight v. Florida</u>, 528 U.S. 990 (1999) had reached twenty-four years and six months when the Supreme Court denied his petition for certiorari. This far exceeded the length of time in the few cases that had then addressed <u>Lackey</u> claims. <u>Id.</u> at 998-99 (Breyer, J., dissenting).

1

1984.[2]   He sought post-conviction review in 1985 and was denied relief by the post-conviction court.  He appealed, and in 1993 this Court reversed the denial of post-conviction relief as to the death sentence, finding that Azania's Sixth Amendment right to effective counsel had been violated by counsel's failure to present any mitigating evidence at the penalty phase.[3]   The majority attributes this passage of time to Azania because he would have appealed and sought post-conviction relief even if the State had not withheld evidence.  Presumably the majority is correct that Azania would have launched an appeal and sought post-conviction relief whether or not the State had withheld evidence.  The 1993 reversal of the death penalty was grounded on ineffective assistance of counsel, not withholding of evidence, but that does not matter for these purposes.  The point here is that whether it was a successful appeal based on the State's wrongful withholding of evidence or upon ineffective counsel, in either case the delay is attributable to the State's failure to provide a necessary element to the proper working of a criminal prosecution.

In simple terms, if the State seeks to kill a human being, it has to get it right.  That means it provides a fair trial, albeit not a perfect one, free of reversible error by the trial court.  It also means the prosecution plays by the rules and does not create reversible error by withholding exculpatory evidence, misleading the jury, or otherwise.  And, importantly in this case, it means that the trial court has appointed defense counsel who provide the adequate representation guaranteed by the Sixth Amendment.  We cannot know what the result of the penalty phase would have been if Azania's counsel had performed up to snuff, and because the State is obligated to provide effective counsel, that shortcoming is attributable to the State, not to Azania.  In short, the Constitution of the United States and the Indiana Constitution require the State to provide a system of criminal justice that is consistent with the requirements of due process of law and fundamental fairness.  That system includes prosecutors, courts, and public defenders for those who are indigent.  If an appeal or post-conviction relief is successful, only the time attributable to the defendant's dithering in achieving that result is fairly deemed caused by the defendant.  The rest is caused by the State, whether in the person of the prosecutor responsible for a mistrial, the trial judge who committed reversible error, or defense counsel provided by the State whose substandard performance produced the need to retry the case.

---

[2] Averhart v. State, 470 N.E.2d 666 (Ind. 1984).
[3] Averhart v. State, 614 N.E.2d 924 (Ind. 1993).

In this case, our 1993 decision noted that there was "a long series of amendments and legal maneuvering" in the post-conviction proceedings. Averhart v. State, 614 N.E.2d 924, 926 (Ind. 1993). Presumably much of this was fairly attributable to maneuvers in the trial court by Azania. But in light of the subsequent history of this case, it is sufficient to note that at least the five years between 1982 and 1993 that were consumed by the two appeals cannot be deemed caused by the defense. After the case was remanded for a new penalty phase in 1993, delays were first occasioned by the State's motions to disqualify appointed defense counsel and two experts retained by counsel. Ultimately that counsel and the experts resigned. A second penalty phase was conducted by new counsel, but African-Americans were inadvertently but improperly excluded from the jury pool. This was affirmed on direct appeal in 2000,[4] but a second post-conviction proceeding was authorized based on the discovery of evidence of the problem in the jury pool. In 2002 we again ordered a new penalty phase before a properly composed jury.[5] All nine of these years were attributable to the appointment of defense counsel who ultimately resigned at the State's insistence and to errors in the county's jury pool selection process. None of this was at the hands of the defendant, so by 2002, at least fourteen of the twenty years that had passed since Azania's conviction are solely attributable to the State.

On remand, Azania moved in January 2003 to transfer the case to Lake County and later to select the jury from that county. These motions were denied in April 2003. The resulting delay of three months may properly be viewed as caused by the defense. The two years until Judge David's decision on June 25, 2005 to dismiss the penalty phase was consumed with ordinary discovery and motions practice. Some of the delays appear to be due to the State's slow responses to discovery and motions, but there is presumably force to the majority's assertion that the defense in a capital case is often in no hurry to reach a resolution. When the penalty is the only remaining issue that contention gains plausibility, so I assume that the majority of the passage of time, say eighty percent, or two years of the thirty months from January 2003 through June 2005, can be viewed as caused by the defendant.

The net result of this exercise is that Azania has spent at least fifteen years on death row due to flaws in the criminal justice system for which he bears no responsibility. Azania has presented this appeal as one grounded in due process and speedy trial rights. Surely these bodies of

---

[4] Azania v. State, 730 N.E.2d 646 (Ind. 2000).
[5] Azania v. State, 778 N.E.2d 1253 (Ind. 2002).

law are relevant and contain instructive principles. But ultimately, as Indiana has recognized in adopting Criminal Rule 24, death is different.[6] That difference is most obvious in the irreversibility of a death sentence once it is carried out. For that reason prosecutors must exercise more than usual care in selecting cases in which the death penalty is sought; trial courts must take additional precautions to see that the case is conducted properly; and appellate courts give heightened levels of review. There is an additional difference that in most cases does not come into play. In <u>Lackey v. Texas</u>, 514 U.S. 1045 (1995), Justice Stevens initially called for consideration of whether the passage of time alone—in that case seventeen years—is sufficient to question whether either retribution or deterrence continues to justify an execution. Echoing those concerns in <u>Knight v. Florida</u>, 528 U.S. 990 (1999), Justice Breyer noted that courts have described imprisonment under threat of impending execution as "horrible," "dehumanizing," and exacting "a frightful toll," frequently leading to suicide attempts and insanity. <u>Id.</u> at 994 (quoting <u>In re Medley</u>, 134 U.S. 160, 172 (1890); <u>People v. Anderson</u>, 493 P.2d 880, 894 (Cal. 1972); <u>Furman v. Georgia</u>, 408 U.S. 238, 288-89 (1972) (Brennan, J., concurring)). In Azania's case we have not only a longer period on death row—twenty-five years—we also have the compounding factor that at least fifteen years of that treatment was due to mistakes of others. That is, in my view, cruel. Thankfully, it is unusual.[7] We have inmates on death row today who were convicted many years ago, but none is the victim of such extensive delays occasioned by the State.

As the majority makes clear, Azania has not presented his claims in terms of the Eighth Amendment to the Federal Constitution or Article I, Section 15 of the Indiana Constitution, both of which prohibit cruel and unusual punishment. Rather Azania argues only that his speedy trial and due process rights have been violated, and the trial judge found a denial of due process of law based on the inordinate passage of time caused by the State. I acknowledge that we routinely treat claims as waived or not presented when an appellant does not raise them or asserts a claim in conclusory terms with no supporting authority or independent reasoning. Once again,

---

[6] Criminal Rule 24 unfortunately came several years after Azania's conviction. It imposes a number of specific requirements on a capital case that do not apply in criminal prosecutions generally. <u>See generally</u> Normal Lefstein, <u>Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation</u>, 29 Ind. L. Rev. 495 (1996).

[7] According to Steven D. Stewart, <u>Indiana Death Row 2006: Capital Punishment in Indiana</u> (July 1, 2006), there are only six defendants in Indiana currently on death row based on convictions or guilty pleas that occurred before 1990, and four of these have obtained no relief from their appeals, post-conviction proceedings, or federal habeas corpus petitions.

however, I invoke the maxim that death is different.  I do not believe we should resolve an issue that directly affects the validity of a death sentence on grounds of waiver, forfeiture, or similar procedural issues, at least when the substance of the argument was fully presented by both sides. Here the issue of length of delay and how it came about were fully presented.  The only question is whether we should restrict ourselves to addressing the implications of that delay as an issue of Fourteenth Amendment due process by reason of the prejudice resulting from the passage of time.  I believe the claim is best understood as a claim that the result of the delay in this case is to impose cruel and unusual punishment as either a freestanding Eighth Amendment claim, a claim that the Fourteenth Amendment incorporates the Eighth Amendment, or a claim that the Indiana Constitution prohibits imposing the death penalty.  I recognize that the Supreme Court of the United States has yet to entertain a Lackey claim despite invitations from Justices Stevens and Breyer to do so.  I therefore cannot conclude that such a claim is established under the Federal Constitution.  I do, however, find the reasoning of Justices Stevens and Breyer to be persuasive and therefore would hold that the Indiana Constitution prevents further pursuit of the death penalty in this case.

**Rucker, Justice, dissenting.**

I agree with the trial court that given the circumstances caused by the long delay in this case, Azania's constitutional rights to a speedy trial and due process would be violated if the State continues to seek a death sentence. A part of the due process violation includes Azania's Eighth Amendment right to present meaningful evidence in mitigation. His inability to do so is of itself sufficient to preclude the State from seeking the death penalty. Therefore I dissent.

The defendant's goal at the penalty phase of a capital trial is quite simple: to save his or her life. To accomplish this end a defendant's social history, relevant psychological history, and any other evidence the defendant deems relevant are generally introduced through family members, friends, associates, co-workers, and others. The defendant hopes that by accumulating relevant facts and stacking them against the weight of the aggravating circumstances of the crime the sentencer will find the defendant is deserving of a term of years rather than the ultimate sanction.

It is through this process, the presentation of the mitigation case, that an individualized judgment is attained.[1] And it is the individualized judgment that ultimately saves capital punishment from constitutional invalidity under the Eighth and Fourteenth Amendments.[2]

---

[1] The Supreme Court has long recognized the desirability of this individualized sentencing scheme in capital cases. Kansas v. Marsh, 126 S.Ct. 2516, 2525 (2006) ("The use of mitigation evidence is a product of the requirement of individualized sentencing."); Gregg v. Georgia, 428 U.S. 153, 189 (1976) (plurality opinion) ("We have long recognized that for the determination of sentences, justice generally requires that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") (citations omitted); Williams v. Oklahoma, 358 U.S. 576, 585 (1959) ("In discharging his duty of imposing a proper sentence, the sentencing judge is authorized, if not required, to consider all the mitigating and aggravating circumstances involved in the crime."); Williams v. New York, 337 U.S. 241, 247 (1949) ("Highly relevant—if not essential—to [a sentencing judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."); Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

[2] California v. Brown, 479 U.S. 538, 541 (1987) (Eighth Amendment jurisprudence establishes that the capital defendant generally must be allowed to introduce any relevant mitigating evidence.); Gregg, 428 U.S. at 193-95 (Mitigating and aggravating factors do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a capricious or arbitrary sentence, which is prohibited under the Eighth and Fourteenth Amendments.); Woodson, 428 U.S. at 304 ("While the prevailing

Plurality opinions in five death penalty cases decided on the same day in 1976 first recognized the capital defendant's Eighth Amendment right to present mitigating evidence. Roberts v. Louisiana, 428 U.S. 325 (1976) (plurality opinion); Woodson v. North Carolina, 428 U.S. 280 (1976) (plurality opinion); Jurek v. Texas, 428 U.S. 262 (1976) (plurality opinion); Proffitt v. Florida, 428 U.S. 242 (1976) (plurality opinion); Gregg, 428 U.S. 153 (plurality opinion). Building upon the Woodson foundation, a plurality of the Supreme Court held in Lockett v. Ohio, 438 U.S. 586, 604-05 (1978), that the Eighth and Fourteenth Amendments require the sentencer not to be precluded from considering, as a mitigating factor, any aspect of a defendant's character or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Exclusion of such evidence was observed to "create[] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." Id. at 605. Subsequently, a majority of the Court clearly embraced Lockett's holding in Eddings v. Oklahoma, 455 U.S. 104, 113-14 (1982). The corollary rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally undisputed. Skipper v. South Carolina, 476 U.S. 1, 4 (1986). The Supreme Court now articulates its mitigation jurisprudence in part as follows: "In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence." Marsh, 126 S.Ct. at 2525. Indiana's death penalty sentencing scheme also provides for the individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments and comports with the United States Supreme Court's holdings by allowing the sentencing court to consider as mitigating "any other circumstance appropriate for consideration." Moore v. State, 479 N.E.2d 1264, 1277 (Ind. 1985) (citing Ind. Code § 35-50-2-9(c)(7) (1977)).

This case presents the unusual situation where a defendant for all practical purposes is precluded from presenting mitigation evidence due to the passage of twenty-six years since the

practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.") (citations omitted).

2

commission of the crime in 1981. An experienced trial judge, who acknowledged that he is "supportive of Indiana's Death Penalty law and believes that the Death Penalty is an appropriate sanction to be imposed in appropriate circumstances," nonetheless found that in this case Azania's right to "present his mitigation case would be severely prejudiced by delay between his conviction and sentencing if the State were allowed to proceed with the Death Penalty." Appellant's App. at 930. I would defer to the trial court.

Multiple mitigation witnesses are now deceased, including: Azania's mother, prior spiritual advisor, and people with whom he worked prior to his arrest. Azania points to these mitigation witnesses as necessary to explain his character and "extreme disadvantage and worthy habits and accomplishments." Br. of Appellee at 12. No matter how inconsequential their testimony might seem to this Court against the heinous crime of killing an officer while committing a bank robbery, that is not for us to decide. The defendant has a right to present all relevant mitigating evidence, which is spoken of in the most expansive terms to mean all "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke, 542 U.S. 274, 284 (2004) (citations omitted). The question is simply whether the evidence *might* serve as a basis for a sentence less than death. Id. at 287. "Once this low threshold for relevance is met, the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." Id. at 285 (citations omitted).

The State in its brief recognizes that the unavailability of witnesses is problematic, but points to the availability of prior testimony that can be presented to the new jury as a mechanism to lessen the prejudice suffered by the passage of time. Amended Br. of Appellant at 15-16. Granted, criminal defendants who prevail in a delayed appeal will ordinarily have a complete and reliable record of the full-fledged adversarial proceeding in which they have been convicted, albeit under circumstances requiring reversal. United States v. Mohawk, 20 F.3d 1480, 1488 (9th Cir. 1994). Such an appellant has this former testimony as a means of combating or at least identifying any prejudice upon the prospect of retrial that might arise from the passage of time. Id. To the extent the State refers to the 1982 trial record as helpful to Azania in any future mitigation phase, this record is deficient given our ruling that counsel was ineffective in

3

presenting the mitigation case. Indeed we observed that counsel did little more than place Azania's mother on the stand and let her give an unguided colloquy in response to the question of whether there was anything she wanted to tell the court. Averhart v. State, 614 N.E.2d 924, 930 (Ind. 1993). Apparently some mitigation evidence was presented in the 1996 trial. See Azania v. State, 730 N.E.2d 646, 652 (Ind. 2000) (noting that the defendant presented evidence and proved the existence of four mitigators). However, we do not, due to the death of these witnesses, know what more Azania's witnesses could tell us that could have a mitigating value beyond what was explored in 1996. Again, the threshold is low, and the Supreme Court has made clear that "[a]ny barrier [to the sentencer's consideration of relevant mitigation in capital cases] must . . . fail." McKoy v. North Carolina, 494 U.S. 433, 442 (1990). When the Supreme Court held that a defendant has a constitutional right to the consideration of mitigating factors, it "clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses." Caldwell v. Mississippi, 472 U.S. 320, 331 (1985). I would echo the words of Justice Blackmun:

> More than any other decision known to our law, the decision whether to impose the death penalty involves an assessment of the defendant himself, not simply a determination as to the facts surrounding a particular event. And an adequate assessment of the defendant—a procedure which recognizes the need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual—surely requires a sentencer who confronts him in the flesh. I therefore conclude that a capital defendant's right to present mitigating evidence cannot be fully realized if that evidence can be submitted only through the medium of a paper record.

Clemons v. Mississippi, 494 U.S. 738, 771 (1990) (Blackmun, J. dissenting) (citations omitted).

Having the best available information possible concerning the defendant's life and character is highly relevant, if not essential, to the selection of an appropriate sentence. Lockett, 438 U.S. at 603. The consideration of Azania's mitigation evidence is a constitutionally indispensable part of the process of imposing the death penalty. Brown, 479 U.S. at 541. Thus, I would affirm the trial court's judgment that under the circumstances of this case, the State is prohibited from seeking the death penalty against this Defendant.

4