**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Jerry Lee SMITH, Defendant–Appellee.**

No. 95–3417.

United States Court of Appeals,
Sixth Circuit.

Argued May 14, 1996.

Decided Aug. 23, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 1, 1996.

Gary D. Arbeznik, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Cleveland, OH, Sean Connelly (briefed), U.S. Dept: of Justice, Crim. Div., Washington, DC, for Plaintiff–Appellant.

David C. Jack (argued and briefed), Sremack & Jack, Akron, OH, for Defendant–Appellee.

Before: NELSON and MOORE, Circuit Judges; CLELAND, District Judge.*

MOORE, Circuit Judge.

The issue before us is whether criminal defendants possess the right to a speedy appeal in the first appeal as of right. In a prior appeal to this court, three years elapsed between the filing of the notice of appeal and the issuance of the court's disposition in this case. On remand for resentencing, the district court found the delay to be violative of due process and released the defendant from custody. Although we agree that the Due Process Clause does provide some minimum guarantee of a prompt appeal to defendants, we hold that the delay in this case did not rise to the level of a due process violation. We reverse the judgment of the district court.

## I. BACKGROUND

In 1991, Defendant Jerry Lee Smith was convicted of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). The government sought to have him sentenced under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), which sets forth a minimum prison term of 15 years for violators of § 922(g) with three prior convictions for violent felonies or serious drug offenses. At his sentencing hearing, however, Smith challenged two of the four prior convictions proferred by the government, arguing that they were founded upon invalid guilty pleas. The district court agreed, finding them to be violative of *Boykin v. Alabama*'s requirement of a knowing and voluntary guilty plea. *See Boykin*, 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1711–12, 23 L.Ed.2d 274 (1969). Rejecting the ACCA mandatory minimum, the district court applied the Sentencing Guidelines and sentenced Smith to 27 months in prison.

On October 16, 1991, the government appealed under 18 U.S.C. § 3742(b), contending, *inter alia*, that the district court lacked the authority to consider Smith's constitutional challenge to his prior convictions, at least for purposes of sentencing under the ACCA. A panel of this court heard oral argument on November 10, 1992 but held the case pending the Sixth Circuit's en banc decision in *United States v. McGlocklin*, 8 F.3d 1037 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1614, 128 L.Ed.2d 341 (1994), which presented essentially the same dispositive issue. On September 17, 1993, the *McGlocklin* majority held, contrary to the government's position, that district courts did in fact possess some limited authority to entertain challenges to prior state convictions

---

* The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

for federal sentencing purposes. At this point, the prior panel could have affirmed the district court in light of *McGlocklin.* Instead, two months later, it issued an order vacating the judgment and remanding Smith's case to the district court because of "the refusal of the District Court to consider whether certain of defendant's prior convictions are constitutionally valid." *United States v. Smith,* No. 91–3986, 1993 WL 503098, at *1 (6th Cir. Dec. 7, 1993) (unpublished order). As stated by the prior panel, "Our recent en banc decision in *United States v. McGlocklin* ... requires that issue be addressed." *Id.*

The prior panel was incorrect, of course, since the district court had already explicitly ruled that the defendant's prior convictions were constitutionally invalid. The district judge consequently wrote a letter to the Sixth Circuit Clerk of Court on December 20, 1993, before issuance of the mandate, explaining that the panel's order "must have been mistakenly issued." Memorandum Opinion, No. 1:95CV0199, at 5 (N.D.Ohio Feb. 24, 1995). On September 1, 1994, the Sixth Circuit withdrew the December 7, 1993 order as having been "entered improvidently" and restored the appeal to the active docket. *United States v. Smith,* 36 F.3d 490 (6th Cir.1994).

Meanwhile, on October 12, 1993, the Supreme Court had granted certiorari in *United States v. Custis,* 988 F.2d 1355 (4th Cir.1993), which involved the same issue as in *Smith* and *McGlocklin. See Custis v. United States,* 510 U.S. 913, 114 S.Ct. 299, 126 L.Ed.2d 248 (1993). Indeed, the prior panel was clearly aware of *Custis* when it entered its order of December 7, 1993, since it included a footnote to alert the parties and the district court as to the grant of certiorari. *See Smith,* 1993 WL 503098, at *1 n. 1. By the time the prior panel withdrew its "improvident" order on September 1, 1994, the Supreme Court had decided *Custis,* holding that defendants could not collaterally attack their previous state convictions during sentencing proceedings under the ACCA, except in instances where they had been denied appointment of counsel. *See Custis v. United States,* 511 U.S. 485, ——, 114 S.Ct. 1732,

1734, 128 L.Ed.2d 517 (1994). In other words, the Supreme Court had essentially overruled *McGlocklin,* although the Court did point out that a prisoner could still reopen his sentencing after successfully challenging his prior convictions in a habeas corpus proceeding. *Id.* at 1739. Shortly after its September 1, 1994 order, the panel in this case filed its final disposition, vacating and remanding for resentencing in light of *Custis. See United States v. Smith,* 36 F.3d 490, 493 (6th Cir.1994). Smith, who had completed his term of imprisonment under the prior sentence and was on supervised release, was returned to custody on January 23, 1995.

Sentencing was rescheduled for January 27, but Smith obtained a continuance in order to file a habeas corpus petition under 28 U.S.C. § 2255. On February 24, 1995, the district court denied the petition, noting that the proper means of challenging state convictions was through § 2254 rather than § 2255. In its order, the district court did observe, however, that the extreme appellate delay in Smith's case appeared to give rise to some questions as to the fundamental fairness of his situation. In his resentencing brief, Smith picked up on this point and argued that the delay in adjudicating the government's appeal constituted a denial of due process. The district court agreed and ordered Smith's release on March 15, 1995. Now, the government again appeals under 18 U.S.C. § 3742(b).

## II. THE RIGHT TO A SPEEDY APPEAL

█ The speedy trial guarantee of the Sixth Amendment applies only to proceedings in the trial court. *See Burkett v. Cunningham,* 826 F.2d 1208, 1219–21 (3d Cir. 1987); 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure,* § 18.5(c) (1984). Our sister circuits have held, however, that a similar guarantee applies to criminal appeals via the Due Process Clause. *See, e.g., Harris v. Champion,* 15 F.3d 1538, 1558 (10th Cir.1994); *Simmons v. Reynolds,* 898 F.2d 865, 868 (2d Cir.1990); *Burkett,* 826 F.2d at 1221–22. In so holding, these courts have first recognized that there is no due process right to an appeal at all, but that an appeal

must nonetheless comport with due process "if a State has created appellate courts as 'an integral part'" of its criminal justice system. *Harris*, 15 F.3d at 1558 (quoting *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985)). These courts have then adopted the speedy trial analysis set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), with slight modifications, as the framework for evaluating delay in the appellate context. *See Harris*, 15 F.3d at 1558–59; *Simmons*, 898 F.2d at 868; *Burkett*, 826 F.2d at 1222; *see also United States v. Antoine*, 906 F.2d 1379, 1382 (9th Cir.), *cert. denied*, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 407 (1990); *United States v. Johnson*, 732 F.2d 379, 381–82 (4th Cir.), *cert. denied*, 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984); *Rheuark v. Shaw*, 628 F.2d 297, 303–04 (5th Cir.1980) (adopting *Barker* analysis in dicta), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981).

In *Barker*, the Supreme Court identified four factors for courts to balance in determining whether a trial delay is unconstitutional: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530, 92 S.Ct. at 2192. According to the Court, none of these factors could be termed "either a necessary or sufficient condition," and courts would be best served by engaging in a "difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. at 2193. With respect to the fourth factor, prejudice, the Court further directed lower courts to consider three interests of the defendant "which the speedy trial right was designed to protect[:] ... (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. at 2193. Lower courts applying *Barker* to appellate delay have since adapted this prejudice factor to fit the circumstances of convicted parties on appeal, identifying three parallel interests: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Harris*, 15 F.3d at 1559 (quoting *Rheuark*, 628 F.2d at 303 n. 8).

█ As a threshold matter, we must decide whether to follow these other circuits in transplanting the *Barker* framework from the trial delay context to the appellate delay context. We believe that we should. First, it makes sense to hold that the Due Process Clause embraces some minimum expectation of a reasonably timely appeal. As noted earlier, the Constitution does not require a state to provide a system of appeals, but if a state chooses to do so, the appeal, too, must accord with the basic requirements of due process. *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985) ("[I]f a State has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant,' the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.") (quoting *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956)). Implicit in this conclusion is the idea that the enactment of an appellate system necessarily "alter[s] the balance between the layers of adjudication in a constitutionally significant manner." Marc M. Arkin, *Speedy Criminal Appeal: A Right Without a Remedy*, 74 Minn.L.Rev. 437, 459 (1990). That is, the introduction of a second tier of adjudication unavoidably affects the operation and significance of the first tier. For this reason, due process places constraints on an appeal even if it does not require an appeal in the first place. The appeal forms an "integral" and inextricable part of the procedures for determining whether a defendant should be deprived of his life, liberty, or property.

When it comes to appellate delay, all courts of appeals addressing the issue have reached the same basic conclusion: "[A]n appeal that is inordinately delayed is as much a 'meaningless ritual' as an appeal that is adjudicated without the benefit of effective counsel or a transcript of the trial court proceedings." *Harris*, 15 F.3d at 1558 (citation omitted). An appeal that needlessly

takes ten years to adjudicate is undoubtedly of little use to a defendant who has been wrongly incarcerated on a ten-year sentence. In our view, the factors set forth in *Barker* and subsequent speedy-appeal cases provide the relevant considerations for investigating such unconstitutional delays. As a result, we adopt the modified *Barker* analysis for examining the delay that took place in Smith's case.

## III. THE DEFENDANT–APPELLEE'S RIGHT TO A SPEEDY APPEAL

Before applying the appellate-delay version of *Barker*, we must answer an additional question in this case: does the right to a speedy appeal extend to criminal defendants who are not the ones appealing? Again, we answer in the affirmative. It might be argued that a defendant-appellee should not be permitted to assert the right, because unlike a defendant-appellant, the appellee's term of incarceration will generally not be affected by undue delay in adjudicating an appeal. In other words, whereas a defendant-appellant with a meritorious appeal might be forced to serve an unjust sentence because of a delay in resolving his appeal, the government's appeal of a criminal sentence does not result in longer incarceration for the defendant-appellee unless and until the government wins its appeal; therefore, speedy appeal rights should only attach to the former situation. In truth, this argument is not a sufficient ground on which to find the modified *Barker* analysis inapplicable to the delay in Smith's case. The *Barker* analysis already contemplates that a delay will sometimes benefit a defendant rather than burden him. If a defendant-appellee ultimately benefits from delay by obtaining an undeserved, temporary release from custody pending the government's appeal, then that absence of prejudice counts heavily against him under *Barker* if he raises a due process claim predicated on appellate delay. Moreover, the absence of one type of prejudice does not mean that a delay cannot prejudice a defendant-appellee in other ways—for example, by impairing his arguments on appeal or his defenses in the event of a resentencing. The fact that a defendant-appellee's length of sentence is unaffected by delay thus provides no basis for distinguishing his due process rights from those of a defendant-appellant. It only provides a basis for assigning different weights to the same factors in the same balancing test.

Similarly, it appears that holding *Barker* applicable to appellants but not appellees would ultimately have little positive effect, if any. It would only induce those few appellees who have not already filed cross appeals to file meritless cross appeals, so that they, too, might reap the lopsided benefit of "appellant" status: the ability to assert a speedy appeal claim. Even in those cases where a defendant-appellee actually preferred delay because it prolonged her temporary release, it would rarely hurt to file a cross appeal—it would preserve the ability to assert the claim without producing, except in the most unlikely circumstances, any speedier a disposition.

In short, we see no persuasive reason for recognizing only a defendant-appellant's right to a speedy appeal. The modified four-factor analysis of *Barker* provides an adequate framework for scrutinizing delays when the government is the appealing party, as well as when the defendant appeals. We therefore proceed to an application of the *Barker* principles to the facts of Smith's case.

## IV. APPLICATION OF THE *BARKER* FRAMEWORK

In determining whether a defendant's right to a speedy trial has been violated, an appeals court reviews questions of law de novo and questions of fact under the clearly erroneous standard. *See United States v. Clark*, 83 F.3d 1350, 1352 (11th Cir.1996). The standard for evaluating cases of appellate delay is the same. Notwithstanding a substantial delay and some singular misfortune for Smith, application of the modified *Barker* framework to the instant case reveals that there was no constitutional violation.

### A. Length of Delay

The length-of-delay factor "is actually a double enquiry." *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992). First, the "length of the

delay is to some extent a triggering mechanism," and unless there is a period of delay that appears, on its face, to be unreasonable under the circumstances, "there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192. Second, if the constitutional inquiry has been triggered, the length of delay is itself balanced with the other factors and may, in extreme circumstances, give rise to a strong "presumption of evidentiary prejudice" affecting the fourth *Barker* factor. *Doggett*, 505 U.S. at 655–57, 112 S.Ct. at 2692–94.

■ *Barker* instructs that "the length of delay that will provoke [a constitutional] inquiry is necessarily dependent upon the peculiar circumstances of the case," 407 U.S. at 530–31, 92 S.Ct. at 2192, although the Supreme Court in *Doggett* has also observed that courts have generally found trial delays approaching a year or more to be enough to trigger the *Barker* analysis. *See Doggett*, 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. Appellate delays are yet another matter, and most courts evaluating such delay have continued to apply the first factor on a case-by-case basis. *See, e.g., United States v. Mohawk*, 20 F.3d 1480, 1485 (9th Cir.1994) (ten-year delay "is 'extreme' by any reckoning"); *Simmons v. Reynolds*, 898 F.2d 865, 868 (2d Cir.1990) (six years "was clearly excessive"); *United States v. Johnson*, 732 F.2d 379, 382 (4th Cir.) (two-year delay "is in the range of magnitude" for triggering inquiry), *cert. denied*, 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984). The Tenth Circuit, though, has taken the bold approach, holding that a two-year appellate delay will create a rebuttable presumption that the constitutional threshold has been crossed. *See Harris*, 15 F.3d at 1559–60. Although following the Tenth Circuit would create a clear benchmark for courts in this circuit, we find it unnecessary to do so at this time. The government concedes that the three-year delay in Smith's case was sufficient to trigger further inquiry, and we agree.

As for the weight to be assigned to the appellate delay, we should note that three years, while unusual and unfortunate, is still shorter than some of the more egregious documented instances. In *Muwwakkil v. Hoke*, 968 F.2d 284 (2d Cir.), *cert. denied*, 506 U.S. 1024, 113 S.Ct. 664, 121 L.Ed.2d 589 (1992), the appellate delay lasted thirteen years; in *Mohawk*, it was ten years; in *Simmons*, it was six. Although the delay here was certainly significant, we must look further into the reasons for such delay, the next *Barker* criterion.

## B. Reason for Delay

■ The government puts forth a rather unassailable reason for the delay: to allow the appellate panel to have waited for the more authoritative decisions of the en banc Sixth Circuit and then the Supreme Court. As explained in *Barker*, "different weights should be assigned to different reasons":

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

407 U.S. at 531, 92 S.Ct. at 2192 (citation omitted). Following these guidelines, we hold that the court's deferral of action while a more authoritative decision was pending counts as a "valid reason" justifying "appropriate delay," and we conclude that the amount of delay in this case was appropriate. Certainly, it was prudent for the prior panel to postpone its decision until the en banc court and Supreme Court had ruled. By the time Smith's case was argued, on November 10, 1992, the Sixth Circuit had already granted rehearing en banc in *McGlocklin* (on July 21). Then, by the time the prior panel issued its original, December 7, 1993 order in this case, two and a half months after the decision in *McGlocklin*, the Supreme Court had already granted certiorari in *Custis*. Although these successive deferrals combined to create a period of almost three years between the government's notice of appeal and the Sixth Circuit's final opinion, it cannot be said that

such period was unjustified, given the unusual flux in the case law on point.

We recognize that Smith may believe he has been the victim of some uncommonly bad fortune. If the prior panel had issued its original order immediately following *McGlocklin*—i.e., within the narrow three-and-a-half-week window between the date *McGlocklin* was decided and the date certiorari was granted in *Custis*—and if the prior panel had correctly read the district court's sentencing determination, it is possible that Smith would have emerged victorious. Instead, the panel did not act right away. While this may have been unfortunate from Smith's standpoint, it certainly provides no basis for finding fault with the court. It was entirely reasonable for the panel to take more than three and a half weeks to revisit and reevaluate Smith's case after *McGlocklin*. The fact that the Supreme Court granted certiorari so soon afterwards merely constitutes unlucky timing for Smith.

Smith goes on to argue that the prior panel's erroneous reading of the district court's sentencing order contributed to the delay in this case, but this is not necessarily so. First, had the panel properly read the district court's treatment of Smith's *Boykin v. Alabama* claims, it might well have disagreed with the decision on the merits. Instead, because the panel incorrectly interpreted the sentencing order as having avoided the issue, it never actually discussed the substance of the issue. Second, even if the panel might have agreed with the district court on the merits of the *Boykin* claim, there is still no guarantee it would have affirmed the district court, because it was obviously aware of the grant of certiorari in *Custis*. Knowing of *Custis*, the panel's wisest course of action would have been to hold Smith's case pending resolution of the identical issue in the Supreme Court, rather than risk issuing an incorrect and potentially final affirmance. This is in fact what it did, when it later realized the error of its original remand. By contrast, the grant of certiorari in *Custis* posed no problems in connection with the panel's original decision to remand to the district court, because either party could subsequently have appealed the district court's decision in light of *Custis*. In other words, there was danger of finality in an affirmance but not in a remand. Finally, the government asserts that even if the panel had affirmed the district court, it would likely have sought certiorari, asked the Supreme Court to hold the case pending *Custis*, and then had the case remanded for resentencing. There is no reason to doubt this claim. Consequently, notwithstanding the prior panel's incorrect interpretation of the district court's sentencing order, it is extremely improbable that this error contributed to the delayed resolution of the government's appeal. It was *Custis* that would have had the last word in any of the likely scenarios, and the Supreme Court's timing in *Custis* was not affected in any way.

## C. Defendant's Assertion of the Right

At no point during the appeal did Smith protest the delay. Although such a protest might not have produced any results, it would at least have indicated to the court that Smith was dissatisfied with the pace of proceedings. As the Supreme Court explained in *Barker*, defendants should normally assert the right to a speedy trial if they want to take advantage of it. While rejecting "the rule that a defendant who fails to demand a speedy trial forever waives his right," the *Barker* Court also noted that "[t]he defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." 407 U.S. at 528, 531–32, 92 S.Ct. at 2191, 2192–93. In this case, by contrast, there is no evidence that Smith was unhappy with the duration of the appeal.

In some circumstances, it might be possible to presume that defendants desire a timely appeal—for example, when a defendant-appellant is in custody and "has little or no incentive to delay the outcome." *Harris*, 15 F.3d at 1563. In this case, however, no such presumption is appropriate, because Smith was afforded a temporary release pending resolution of the appeal. In general, a temporary release should provide strong evidence that a defendant has *benefited* from delay, rather than been burdened by it. In

the absence of any assertion of the right, then, the third *Barker* factor does not weigh in favor of defendants like Smith, who have no apparent incentive to hurry the appellate process.

## D. Prejudice

 As noted earlier, several circuits have adapted the trifurcation of *Barker*'s prejudice analysis into the following considerations: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Harris,* 15 F.3d at 1559 (quoting *Rheuark,* 628 F.2d at 303 n. 8). From the outset, we can see that the first factor, preventing oppressive incarceration pending appeal, does not help Smith at all. Indeed, it appears to us that Smith's benefit from temporary release acted as a counterweight to the prejudice stemming from the second factor, the anxiety of awaiting the outcome of the appeal. The degree to which delay increased Smith's agony over his uncertain fate was directly proportional to the degree to which that delay extended his temporary freedom from incarceration. The district court found that Smith was prejudiced because he "assumed additional familial responsibilities" by fathering a child, something which falls within the second factor of the prejudice inquiry. Order, No. 1:91CR0096, at 2 (N.D.Ohio Mar. 15, 1995). Yet, we should also realize that Smith profited from the delay to the extent that it gave him the opportunity to live with his family and father the child in the first place. Of course, these first two factors of the prejudice analysis do not necessarily cancel each other out in every instance involving temporary release—each case will depend upon its own particular facts. Nevertheless, there can be little doubt that, in Smith's case, these factors weigh in like manner on opposite sides of the balance.

According to *Barker* and *Harris,* the most serious factor in analyzing prejudice is the third one, prejudice to the ability of defendant to assert: (i) his arguments on appeal and (ii) his defenses in the event of retrial or resentencing. *See Barker,* 407 U.S. at 532, 92 S.Ct. at 2193; *Harris,* 15 F.3d at 1563. On this score, Smith's position is also weak. First, the dispositive issue before the prior panel—whether a defendant may collaterally challenge prior state convictions for federal sentencing purposes—was one of pure law; thus, the delay did not have any effect on Smith's argument in favor of allowing such collateral challenges. Second, the panel ultimately decided the issue against Smith, following *Custis;* thus, since Smith was effectively left with nothing to argue upon resentencing (except his new speedy appeal claim), there was no danger of prejudice to any of his arguments. Unlike the situations in *Harris* or *Coe v. Thurman,* 922 F.2d 528 (9th Cir.1990), where defendants brought habeas corpus actions in federal court while state appeals were still pending, we have the benefit of hindsight on the appeal in Smith's case. In these circumstances, the standard for evaluating prejudice to a retrial or resentencing, therefore, is not whether the defendant has "credible grounds for reversal and retrial" and can show that the delay impaired her defense on retrial or resentencing. *Harris,* 15 F.3d at 1564. The standard here is whether the appellate court's delayed ruling actually preserved any arguments to assert on retrial or resentencing, and whether the defendant's ability to assert these arguments was affected. In the instant case, it is apparent that Smith cannot bring forward a jot of evidence showing this type of prejudice against him.

 Our final consideration is whether any significant amount of "presumptive prejudice" should figure into the *Barker* analysis. In *Doggett v. United States,* the Supreme Court held that extreme cases of delay would produce a strong presumption of prejudice to the ability of a party to defend itself at trial, and the "extraordinary" eight-and-a-half-year delay there was found to be one such case. 505 U.S. 647, 655–58, 112 S.Ct. 2686, 2692–94, 120 L.Ed.2d 520 (1992). According to the Court:

> [W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that nei-

ther party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay.

*Id.* at 655–56, 112 S.Ct. at 2693 (citation omitted). This language, though commonly misread, states quite clearly that any "excessive delay"—that is, *any* delay triggering the *Barker* analysis—will generally give rise to a presumption of prejudice, and the only question is how much "importance" to assign to that prejudice. Under such direction, we hold that the presumptive prejudice arising out of the three-year delay in this case, if any, is negligible at best. Because the three-year period does not approach the "extraordinary" eight-and-a-half-year delay in *Doggett,* or approach the periods found in many other cases involving appellate delay, *e.g., Muwwakkil; Mohawk,* we believe that the prejudice here would be overcome by the other *Barker* factors if balanced against them. Moreover, we conclude that the prejudice does not even make it as far as the balancing test, because the government has successfully rebutted any discernible presumption in this case: there can be no doubt that Smith's ability to defend himself at resentencing has remained wholly unimpaired. *See Doggett,* 505 U.S. at 658 n. 4, 112 S.Ct. at 2694 n. 4.

Notably, the circuits have sent conflicting signals as to whether *Doggett* should even be deemed pertinent to the sphere of appellate delay. In *Harris,* 15 F.3d at 1564, and *Taylor v. Hargett,* 27 F.3d 483, 486 (10th Cir. 1994), the Tenth Circuit appeared to indicate in dicta that *Doggett* would be applicable to speedy appeal cases. By contrast, the Ninth Circuit in *United States v. Mohawk,* 20 F.3d 1480, 1487–88 (9th Cir.1994), went to considerable lengths to explain why *Doggett*'s speedy trial rationale should be found inapposite. *See also Heiser v. Ryan,* 15 F.3d 299, 304 (3d Cir.) (uncertain as to *Doggett*'s relevance), *cert. denied,* —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994); *Elcock v. Henderson,* 28 F.3d 276, 279 (2d Cir.) (conclusorily dismissing *Doggett* considerations as "not relevant"), *cert. denied,* —— U.S. ——,

115 S.Ct. 456, 130 L.Ed.2d 364 (1994). In our view, there is no reason why *Barker*'s speedy-trial analysis should apply to cases of appellate delay but *Doggett*'s speedy-trial presumption of prejudice should not. The *Mohawk* opinion states that it is much easier to identify and combat prejudice to one's ability to retry a case than to one's ability to try a case for the first time, because:

> If important witnesses have become, for one reason or another, unavailable, their former testimony may be introduced at the second trial. *See* Fed.R.Evid. 804(b)(1). If memories have faded, they can be refreshed, using the record compiled in the first trial. *See* Fed.R.Evid. 612. If key testimony unaccountably changes, it can be impeached by the same means. *See* Fed. R.Evid. 613. As for the opportunity to collect exculpatory evidence, a defendant is in no sense deprived of this by a delay before retrial, so long as he was able to pursue this opportunity in connection with his original trial. *See id.*

20 F.3d at 1488 (citation omitted). The problem with this analysis is that it assumes safe reliance on the evidence obtained during the original trial. Yet the whole point of a retrial is that something was materially wrong with the original one. If the trial court erroneously excluded a defense theory (e.g., insanity, self-defense, alibi), or evidence material to the defense, there is nothing in the original trial that will assist the defendant in presenting that theory or evidence on retrial. Similarly, if the defendant prevails on appeal via a *Brady* claim, the wrongfully withheld exculpatory evidence will still only be presented for the first time on retrial. Hence, the "so long as" in the last sentence of the quoted passage is a rather large "so long as." To be sure, there will be numerous instances in which the evidence at the original trial shall be considered reliable, but the availability of a reliable record in a given case only means that it will be easy to rebut any presumption of prejudice arising out of excessive delay. There is no reason why it should have any bearing on whether the presumption should apply in the first place. We deem *Doggett* relevant, but we hold that the presumption of prejudice, if any, in this case

of three-year appellate delay, has been clearly rebutted.

Because we discern no due process violation in Smith's case, we do not need to reach the question of the appropriate remedy.

## V. CONCLUSION

In summary, we hold that criminal defendants do possess the right to a reasonably timely appeal under the Due Process Clause—regardless of whether they are appellants or appellees—but that defendant Smith's rights were not violated in this instance. Adopting the multi-factor test of *Barker v. Wingo*, as modified for appellate delay, we find that only the first factor, the length of delay, weighs in Smith's favor, and not overwhelmingly so. We adhere to the prior panel's decision and **REVERSE** and **REMAND** for resentencing under the ACCA.